FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 AUG -1 PM 2: 06

U.S. DISTRICT COURT
N.D. OF ALABAMA

THOMAS G. GIVHAN, }
}
    Plaintiff, }
}
v. }    CASE NO. CV 94-B-2619-S
}
HOFFMAN-LaROCHE, INC., }
}
    Defendant. }

ENTERED

AUG 01 1997

**MEMORANDUM OPINION**

    This case is before the court on the question of the admissibility at trial of a report and testimony from plaintiff's proposed expert, Ms. Yvette Smiley-Smith. Defendant Hoffman-LaRoche, Inc. ("Roche") argues that Ms. Smiley-Smith does not possess any expertise in the area in which she would testify, her opinions are not reliable and not based on any scientific methodology, and even if Ms. Smiley-Smith were qualified to testify and the opinions were reliable, those opinions should be excluded under Federal Rule of Evidence 403 as confusing and misleading. Plaintiff disputes these contentions by defendant and argues that Ms. Smiley-Smith's opinions are both relevant and reliable and that she is qualified to give them. Upon consideration of the record, the testimony of witnesses, the memoranda of the parties, and the argument of counsel, the court is of the opinion that the report and proposed testimony of Ms. Smiley-Smith are due to be excluded from the trial of this case.

**FACTUAL SUMMARY**

**A. Qualifications of Yvette Smiley-Smith**

    Ms. Smiley-Smith graduated from college in 1970 with a B.S., *summa cum laude*, in accounting from Hampton University in Virginia. In 1975, she took some courses toward an

93

M.B.A. from Auburn University at Montgomery in Montgomery, Alabama. She has been a certified public accountant in Alabama since 1975 and in Georgia since 1973. From 1976 to 1983, Ms. Smiley-Smith worked for the Public Service Commission in an accounting and auditing capacity. Since 1984 she has been in private practice, primarily as an expert consultant. From 1984 to the present, Ms. Smiley-Smith has been a "Utility Regulatory Consultant--'In the Public Interest'" and a member of the firm Smith, Bright and Associates, specializing in providing expert testimony before regulatory commissions in matters primarily concerned with the determination of the appropriate rates and charges for retail energy and telecommunications services. (Pl.'s Ex. 1 to Hearing on July 17, 1997, Resume of Yvette Smiley-Smith ("Res. #2")[1] at 2). Furthermore, since November 1994, Ms. Smiley-Smith has been a member of the firm Smiley-Smith, Smiley-Munnerlyn & Bright, "The Cutting Edge in Trial Consulting." (*Id.*) This firm provides expert testimony in civil litigation on a number of financial issues, including:

(1) assessments as to the current or pro forma financial condition, worth, viability of a business entity;
(2) financial impact/ramifications of specific events, circumstances or occurrences on persons and/or entities;
(3) valuation quantifications as to business worth;
(4) economic loss quantifications resulting from personal injury or wrongful death claims;
(5) economic loss occasioned by employment discrimination claims;
(6) quantifications as to the financial impact/economic loss to person(s) or entities resulting from claims of fraudulent or illegal practices, patterns or procedures.

(*Id.* at 3).

---

[1] At the hearing on July 17, 1997, defendant introduced as its exhibit number 1 a copy of Ms. Smiley-Smith's resume that had been provided to defendant by plaintiff. Plaintiff submitted an updated copy of that resume as his exhibit number 1. The court will refer to this updated resume as "Res. #2."

According to her resume, Ms. Smiley-Smith has testified in a number of proceedings, both administrative and judicial. Ms. Smiley-Smith has been involved in approximately ten civil judicial proceedings since 1995 in which her expertise was used in determining the level of potential damages due to a plaintiff. (*See id.* at 15-20). Of those cases, only one involved employment discrimination. (*Id.* at 19). At the July 17, 1997 hearing, Ms. Smiley-Smith stated that in that employment discrimination case she was hired by the defendant to assess the plaintiff's damages. Ms. Smiley-Smith was not deposed and did not testify in that case, nor was she certified as an expert, because the case settled. Furthermore, Ms. Smiley-Smith conceded at the hearing that she does not have any expertise in the area of evaluating sales performance and rating sales representatives. Finally, nothing in Ms. Smiley-Smith's resume or testimony points to any expertise in detecting employment discrimination in general.

### B. The Expert Report and Proposed Testimony of Ms. Smiley-Smith

Plaintiff brought the present action following his termination from defendant. Plaintiff had worked for defendant for a number of years but was terminated following a debilitating accident. Plaintiff's complaint and amended complaints contained a number of allegations, but the court granted partial summary judgment in favor of defendant on September 30, 1996. In granting defendant's motion for partial summary judgment, the court dismissed all of plaintiff's claims except for his allegations of race and age discrimination in connection with his annual merit wage increases. Those claims constitute the only remaining issues for trial.

One significant portion of plaintiff's alleged damages involves the computation of his long term disability payments. Those disability payments were calculated on the basis of plaintiff's base salary in 1992, the last year in which he worked. Plaintiff contends that his base salary was

3

too low as the result of illegal discrimination and that had he been properly compensated, his disability payments would have been and would be higher. In support of this claim, plaintiff has submitted an expert report from Ms. Yvette Smiley-Smith ("expert").

As will be discussed in greater detail below, sales representatives, including plaintiff, in plaintiff's division were evaluated in three different stages during the year. They received mid-year and end-of-year performance evaluations and a merit review near the end of the year. In the mid-year and end-of-year evaluations they were given "product ratings," based on their success in selling products for defendant, "job skills ratings," based on their observable behavior in the field, and a final "performance rating," based on a combination of the above. The representatives were paid a bonus depending on their success in selling products and the level of their product ratings. Additionally, during their merit review, representatives were given a "merit review rating," which was based primarily on their job skills rating. This merit review rating determined the extent to which a representative's base salary would increase from that year to the next.

In her report, Ms. Smiley-Smith purported to examine this system used by defendant for rating its employees. Ms. Smiley-Smith concluded that the system used by defendant was flawed and that plaintiff was consequently underpaid by defendant. (Expert Witness Report of Yvette Smiley-Smith, Def.'s Ex. 2 to Hearing on July 17, 1997 ("Exp. Rep.") at 7). According to Ms. Smiley-Smith, if the proper "barometer" for performance had been used, it would have shown that plaintiff's performance was at a level comparable to the "top" sales representatives. (*Id.* at 6). According to the report, plaintiff's success was not properly recognized, and plaintiff's merit review rating was lower than it should have been. Consequently, plaintiff's salary was not increased as it should have been and was, therefore, too low in 1992 when his long-term disability

4

payments were computed. Ms. Smiley-Smith concluded that had plaintiff been properly ranked at a level equal to these "top" performers, he would have been paid a salary comparable to theirs. As a result, Ms. Smiley-Smith concluded that plaintiff's long-term disability payments should have been based upon $39,172, which Ms. Smiley-Smith reported was 60% of what plaintiff's base salary would have been in the absence of discrimination. (*Id.* at 8). Based upon that determination, Ms. Smiley-Smith concluded that the present value (at the time of the report) of plaintiff's long term disability payments was $523,387 (or $669,000 when adjusted for inflation). (*Id.* at 8).

According to this expert report, the Drug Distribution Data (DDD) Reports were a prime source of information for evaluating defendant's sales representatives. (*Id.* at 2). Various indexes computed from the DDD reports were "utilized as prime evaluative tools" in determining the performance of the sales representatives. (*Id.*) These include the market value index (MVI), the Roche sales index (RSI), the performance index (PI), and the "therapeutic class index" (TCI).[2] Ms. Smiley-Smith stated in her report that although these indexes "may be valid barometers for assessing the market potential or sales potential of a given territory," they are not "appropriate for measuring the sales efforts/effectiveness of a given Sales Representative." (*Id.*) According to Ms. Smiley-Smith, these indexes are inappropriate for measuring individual performance because the territories in which the representatives operate are different and unequal in terms of their available markets. In other words, because territories differ in the market potential of each, and because

---

[2] Except for the performance index, these indexes were computed by taking the ratio of sales in a territory to sales in the United States. For example, RSI divided total Roche sales for a territory (presumably for a given product) by total Roche sales in the United States (for that product). (*See* Exp. Rep. at 18-20).

the indexes compare territory sales to total United States sales, measuring a sales representative's performance in terms of his or her sales dollars is unfair because that representative does not necessarily have the same opportunity as another representative. (*Id.* at 3).

Ms. Smiley-Smith offered an example using the DDD Sales Index. According to Ms. Smiley-Smith, this index is computed by dividing the actual sales of a representative by total sales in the United States. The inequity arises here, according to Ms. Smiley-Smith, because territories are unequal. The example is as follows: Assume territory A has a total market potential of $1000 and territory B has a total market potential of $2000. Assume further that total sales in the U.S. are $10,000. Finally, assume that representative A in territory A and representative B in territory B both have sales of $1000. Representatives A and B would both have sales indexes of .10, but A would have garnered 100% of his or her market and B would have controlled only 50% of his or her market. According to Ms. Smiley-Smith, the sales index is, therefore, "woefully inadequate in measuring the effectiveness of the sales effort." (*Id.* at 4).

In Ms. Smiley-Smith's opinion, the "only endemic DDD barometer which does not suffer from the intrinsic flaws outlined above . . . is the Market Share as listed on the Therapeutic Class Report (TCR) of the DDD." (*Id.* at 4). "TCR market share" takes the ratio between total dollars for each product within a territory and total dollars for the therapeutic class within that territory. (*Id.*) Thus, according to Ms. Smiley-Smith, the universe in which a representative is judged is his or her own territory, over which the representative can presumably exercise some control, and this measure is more equitable than all of the others. (*Id.* at 4-5). Using the example mentioned above, TCR market share for representative A would be $1000/$1000, or 100%, and TCR market share for representative B would be $1000/$2000, or 50%. Ms. Smiley-Smith concluded: "This

6

is an equitable measurement in that it fairly and comprehensively reflects the effectiveness of the sales effort in a manner that allows for absolute and comparative assessment of the Sales Representative." (*Id.* at 5).

Ms. Smiley-Smith noted that when plaintiff was ranked according to such indicators as the RSI or PI, the plaintiff's performance fell at or near the bottom of defendant's Dixie division (plaintiff's division). (*Id.* at 6). According to Ms. Smiley-Smith, plaintiff's territory also had a low potential market value compared to some other territories, and Ms. Smiley-Smith apparently assumed that this accounted for his low scores on those indexes. (*Id.*) However, using TCR market share as the evaluative "barometer," Ms. Smiley-Smith concluded that plaintiff would then be "in viable competition with the heretofore, so-called 'top' employees." (*Id.*) Therefore, Ms. Smiley-Smith determined that plaintiff was actually one of the top performing employees.

Ms. Smiley-Smith also considered factors other than TCR market share in evaluating what she considered plaintiff's actual performance to be. She stated:

> In addition to the TCR market share comparisons which evidence Givhan's ranking as one of the top performing employees, it is obvious from the perusal of the personnel files of the Sales Representatives that:
> -- evaluations were not conducted in accordance with the Policy & Procedures Manual criteria;
> -- inconsistent criteria were applied in the evaluation of employees;
> -- inappropriate credit was accorded employees in Givhan's peer group;
> -- clear abuse of discretion weighed heavily in the evaluation process;
> -- evaluations which were virtual "dead-heats" were many times subtly couched in favor of employees other than the Plaintiff.

(*Id.* at 6-7). Based on the above analysis, Ms. Smiley-Smith went on to conclude that based upon the plaintiff's performance "as documented by the appropriate DDD statistics," the "clear discriminatory slant" in the evaluations, and the "inconsistencies noted in the evaluative process,"

7

it was "painfully apparent" that plaintiff was not given the ratings and evaluations he deserved nor was he accorded "the same bases of evaluation as that accorded his peers." (*Id*. at 7).[3] In other words, Ms. Smiley-Smith determined that because defendant used a flawed evaluative process and did not rely exclusively on TCR market share in evaluating its employees, plaintiff was given merit review ratings below that which he supposedly deserved. Therefore, according to Ms. Smiley-Smith, plaintiff was deprived of just compensation.

Because plaintiff had been deprived of just compensation, according to Ms. Smiley-Smith, the appropriate level of compensation had to be determined in order to calculate the proper base for plaintiff's long-term disability. Ms. Smiley-Smith stated in her report that, "[a] reasonable surrogate for that compensation is the compensation levels enjoyed by those employees with whom Givhan truly ranked, if that ranking was appropriately done. Such employees are Havicus, Carroll and Robbins." (*Id*. at 8). It is from this comparison that Ms. Smiley-Smith determined that the proper base for plaintiff's long term disability payments should be $39,172.

As is suggested from the above, Ms. Smiley-Smith ultimately concluded that plaintiff had been treated differently than similarly situated employees by defendant. (*Id*. at 17). This conclusion was based on an analysis of the DDD reports, especially TCR market share, and on a "comparative analysis of key personnel data." (*Id*.) As is noted in her report and as she admitted at the hearing, Ms. Smiley-Smith compared plaintiff only with Edna Carroll, Suzy Robbins and Randy Havicus. Ms. Smiley-Smith stated that she chose those employees because her task was to test the plaintiff's contention that he should have been one of the highest rated

---

[3] Despite this language in her report, Ms. Smiley-Smith testified at the Rule 104(a) hearing that she did not re-evaluate defendant's employees.

8

employees. Therefore, Ms. Smiley-Smith chose to compare plaintiff to those employees who were highly rated. Ms. Smiley-Smith did not compare plaintiff to the other employees in the division because they were not as highly rated as these others. Because Ms. Smiley-Smith did not examine these other employees, their TCR market shares or their various evaluations, she has said nothing about whether they were treated the same as plaintiff and differently than "similarly situated" employees or whether or not they were similarly situated to plaintiff.

### C. Testimony of Vincent Principi

Vincent Principi, the Division Manager of the Dixie Division since June 1984, testified at the July 17, 1997, hearing regarding his role in and his understanding of the evaluative process. As the division manager, he was responsible for evaluating plaintiff and the other sales representatives in the Dixie Division during all relevant time periods. He testified that two main evaluative tools are used to assess the performance and ability of sales representatives. These are the product rating and the job skills rating. According to Mr. Principi, the product rating for a given representative is determined for the mid-year and end-of-year evaluations and is used primarily to determine the bonuses paid to that representative. The job skills rating is also determined during the mid-year and end-of-year evaluations, and it is used primarily to determine the representative's performance on the merit review. The merit review rating is used to determine by what percentage a representative's base salary will increase from that year to the next.

According to Mr. Principi, the product rating evaluates a representative's performance in selling products for defendant. No mathematical formula is used to determine a representative's product rating and the process is somewhat flexible. Mr. Principi's determination of a product

9

rating for a representative is controlled by certain guidelines, however. Market share or growth of market share for a given product can be important for some products. The extent to which a representative meets his sales goals is very important to the determination of a representative's product rating, particularly with respect to products that are important to the company. Heavy weighting is given to a product that is a major product of the company. If the product is particularly important, then the level of a representative's success with that product would have a larger impact on his product rating.

The sales goals for the representatives are generally determined by the sales representative themselves based upon a mathematical formula. The company sets goals for each region which then sets goals for each division. The representative determines the sales goal for a given product in his or her territory by dividing the sales index for that territory by the class index and multiplying the result by two and then multiplying that result by the division goal. According to Mr. Principi, dividing the sales index by the class index is supposed to factor out the effects of having a territory with a smaller market potential so that those representatives with smaller territories are not disadvantaged. In other words, this formula is designed to ensure that a representative in a smaller territory will have a smaller sales goal. Using this formula the representative would compute a sales goal for each product, expressed in terms of dollar sales. The goal would be in writing, and both the representative and Mr. Principi would have a copy. Typically, the goals would not be adjusted during the year unless the company adjusted its goals, which would have a concomitant effect on the individual sales goals. The extent of the representative's achievement of the sales goal for each product is determined by dividing the actual sales for that representative by the sales goal and expressing the result as a percentage of the goal.

10

A sales representative's job skills rating is determined by Mr. Principi based upon his observation of the representative. Mr. Principi stated that he considers all observable behavior "in the field," and he acknowledged that this is a highly subjective evaluation. Mr. Principi stated that, in accordance with his training as a division manager, he tries not to consider the success of a representative in actual sales in determining the job skills rating. Mr. Principi conceded, however, that he is not always able to separate the job skills determination from the representative's actual performance. Mr. Principi did note, however, that good job skills often lead to good sales, and, therefore, a representative will often be rated highly for job skills if his or her product rating is high, though the two need not necessarily correlate. Furthermore, Mr. Principi noted that on occasion a representative will get lucky and have good sales and a high product rating even though his or her job skills are, in fact, substandard. Thus, it is possible to have a high product rating and a low job skills rating, according to Mr. Principi.

As noted above, the product rating is used to determine the amount of any bonus that a representative receives each year. The job skills rating is the primary determinant for the representative's merit review rating, which, in turn, dictates the percentage by which the representative's base salary will increase. According to Mr. Principi, because different criteria are used to determine bonuses and increases in salary, a representative will not necessarily receive a high increase in salary just because the representative had high sales. As a matter of fact, the two may often seem to correlate, but they do not necessarily have to.

## DISCUSSION

Plaintiff has offered Ms. Smiley-Smith as an expert in this case. Therefore, plaintiff must prove by a preponderance of the evidence that Ms. Smiley-Smith's opinion is admissible. *Daubert*

11

*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)). The court evaluates the qualifications of a person to be an expert witness and determines the admissibility of evidence from that witness according to Federal Rule of Evidence 104(a). *See id.* at 592. In considering the admissibility of expert testimony, the court considers certain general rules of evidence as well as Federal Rule of Evidence 702, which is specifically directed to evidence from experts. The starting point is that all relevant evidence is admissible, "except as provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." Fed. R. Evid. 402. "Relevant evidence" is that evidence having a tendency to make the existence of any material fact more probable or less probable than it would be without that evidence. Fed. R. Evid. 401. Under Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The Supreme Court evaluated the interaction of these rules in *Daubert* and developed a test for the admission of scientific expert testimony.[4] Expert scientific testimony is admissible only

---

[4] The parties have engaged in some discussion of whether Ms. Smiley-Smith's expertise is scientific, technical or based upon "specialized knowledge." The court is of the opinion that Ms. Smiley-Smith's report and testimony are scientific in nature, rather than merely technical or otherwise. Ms. Smiley-Smith's supposed expertise derives from her experience and training as an accountant. Although accounting may not be a "pure" science, it is more than merely technical or other specialized knowledge. In fact, it is sometimes defined as an "art." Webster's Encyclopedic Unabridged Dictionary of the English Language 13 (Random House 1996). Accounting and, more specifically, the process used by Ms. Smiley-Smith here involves applying a methodology to a set of facts to draw conclusions from those facts. The court is of the opinion that this involves "science" and that *Daubert* applies in the present situation.

12

if it is both reliable and relevant. *See Daubert*, 509 U.S. 589-91. Relevance is not at issue in the present case. The issues in the present case, therefore, are whether or not the proposed evidence is reliable and whether or not Ms. Smiley-Smith is qualified to give it.

In determining the admissibility of expert testimony, the court must make a preliminary assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts at issue." *Id*. at 592-93. The *Daubert* Court listed a number of non-exclusive factors that would be helpful in making this assessment. These are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) what is the known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance." *Id*. at 593-94. A court testing the admissibility of expert evidence should consider each of these factors, but none of them is necessarily controlling. *See id*. *Daubert* emphasized that this inquiry is a flexible one whose "overarching subject is the scientific validity-- and thus the evidentiary relevance and reliability--of the principles that underlie a proposed submission." *Id*. at 594-95. Perhaps one way of summarizing these factors is to state that the proposed expert evidence must be "supported by appropriate validation--*i.e.*, 'good grounds,' based on what is known." *See id*. at 590.

Ms. Smiley-Smith has developed a theory for the way in which plaintiff's performance should have been evaluated, and plaintiff seeks to introduce this theory and Ms. Smiley-Smith's report and testimony into evidence to support plaintiff's case. The evidence that plaintiff proposes to submit from Ms. Smiley-Smith suffers from two main flaws, however. The methodology or theory underlying Ms. Smiley-Smith's report is unreliable and Ms. Smiley-Smith is not qualified

13

as an expert to reach the conclusions and make the assumptions[5] that she makes in developing and applying her theory and methodology. More specifically, Ms. Smiley-Smith's methodology has not been subjected to any sort of independent validation. Furthermore, Ms. Smiley-Smith's conclusions are based on a method of evaluation not used by the company. Finally, the report's reliability is hampered by Ms. Smiley-Smith's lack of qualification as an expert in this area. This last point goes to both reliability and qualification. *See Joiner v. General Electric Co.*, 78 F.3d 524, 532 (11th Cir. 1996) (stating that experience and specialized expertise are most relevant to the issue of qualification, but they also have some bearing on the question of the reliability of the underlying reasoning or methodology) (citation omitted), *cert. granted*, 117 S. Ct. 1243 (1997).

Plaintiff has presented no evidence that Ms. Smiley-Smith's theory has been tested, has been subjected to peer review and publication, or that it enjoys any sort of "general acceptance." Furthermore, no evidence has been presented about any potential rate of error for her theory. In fact, no evidence of any independent validation has been presented to support Ms. Smiley-Smith's theory and report. As the Eleventh Circuit has held, "an expert's bald statement that he or she is imparting 'scientific knowledge' does not automatically render that expert's opinion admissible." *Joiner*, 78 F.3d at 529. In fact, the *Daubert* requirements of reliability and relevance are designed to ensure that "unsupported speculation" is excluded by the trial court. *Id.* at 529-30.

Ms. Smiley-Smith argues for and relies on her theory that TCR market share is the fairest indicator of the level of performance of defendant's sales representatives. The basis for this

---

[5] In fact, some of the basic premises underlying Ms. Smiley-Smith's methodology and conclusions are just that--assumptions. They are not based upon any expertise or otherwise specialized knowledge. This will be discussed further *infra*.

14

theory is that the "divisor" in the computation of TCR market share is total sales for the therapeutic class within a given territory, as opposed to total sales in the United States. Thus, Ms. Smiley-Smith assumes that TCR market share is a fairer barometer than all others for assessing performance because the representative can presumably influence the "universe" against which he or she is being judged. This theory, however, is nothing more than an assumption; it is Ms. Smiley-Smith's subjective opinion, and it is not based on any expertise. In other words, this theory is "unsupported speculation." Ms. Smiley-Smith has no experience in evaluating sales personnel; in her hypothetical, discussed *supra*, she assumes, without any apparent basis other than her own speculation, that a representative who garners all of a small market has necessarily worked harder and been more effective than another representative who garners only a portion of a larger market;[6] she essentially ignores change in market share, which is arguably more reflective of effort than the absolute value of the market share; and she ignores the measure of percentage of sales goal achieved and the fact that sales goals are computed on the basis of the size of the territory. In her report, Ms. Smiley-Smith made statements such as, "[t]he only endemic barometer which does not suffer from the intrinsic flaws outlined above and, therefore, can be used to evaluate the performance of a Sales Representative" is the TCR market share. (Exp. Rep. at 4). Ms. Smiley-Smith also stated that TCR market share "is an equitable measurement in that

---

[6] Part of Ms. Smiley-Smith's argument in support of her methodology seems to be that it is not fair to evaluate a sales representative on the basis of total sales dollars when territories are unequal in terms of total market potential. This premise is well enough for what it is worth. What this premise ignores, however, is that defendant does not evaluate representatives on the basis of gross sales dollars. Defendant evaluates representatives, among other ways, on the basis of the percentage of their sales goal that they achieve. This measurement is as close to basing the evaluation on gross sales as defendant gets, and it takes into account the differences among territories.

15

it fairly and comprehensively reflects the effectiveness of the sales effort in a manner that allows for absolute and comparative assessment of the Sales Representatives." (*Id*. at 5). Plaintiff has introduced no evidence to show that Ms. Smiley-Smith has the knowledge, skill, experience, education or training to make these assumptions and reach these conclusions.

Ms. Smiley-Smith's report is also flawed because it uses a method of evaluation not used by the defendant. As the Eleventh Circuit has held, "[i]n an employment discrimination context . . . expert testimony should be excluded when it involves an assessment method not used by the decisionmaker." *United States v. City of Miami*, 115 F.3d 870, 873 (11th Cir. 1997) (citing *Hill v. Seaboard Coast Line R.R.*, 767 F.2d 771 (11th Cir. 1985)). The primary determinant used by defendant for setting bonuses and for assessing the performance of sales representatives is the product rating. The product rating is determined on the basis of the percentage of sales goals achieved, the market share and change in market share, and other factors as explained by Vincent Principi. The primary factor used by defendant in determining a sales representative's percentage increase to base salary is the job skills rating, as applied through the merit review. Ms. Smiley-Smith has ignored the majority of these factors used for assessing the performance and abilities of a sales representative and focused on one isolated measure of performance, the TCR market share. Thus, Ms. Smiley-Smith has used an assessment method not used by defendant. Although defendant does take market share into account, defendant considers many other things as well. Furthermore, defendant does not take market share into account when determining the base salary raise received by a sales representative; defendant bases this raise on the job skills rating. Ms. Smiley-Smith's use of market share to assess job skills and evaluate increases to base salary is

inappropriate in that the defendant does not use that method of assessment. For these reasons alone, Ms. Smiley-Smith's report and testimony are due to be excluded.

Another flaw in Ms. Smiley-Smith's report is her decision not to consider all of the representatives within the Dixie Division. On the basis of the comparison of the TCR market share scores of plaintiff with the scores of Havicus, Robbins and Carroll, Ms. Smiley-Smith concluded that plaintiff was discriminated against and treated differently than similarly situated employees. The implication of this conclusion was that this disparate treatment was the product of illegal race or age discrimination. Yet, the Dixie division had between thirteen and fifteen employees in any given year during the relevant time period. Ms. Smiley-Smith did not consider the majority of these other employees. Thus, she cannot say whether these employees were also treated "unfairly" by the defendant's decision not to rely exclusively on TCR market share in evaluating employees. For all that Ms. Smiley-Smith knows, if her methodology and its focus on TCR market share were applied to all of the employees in plaintiff's division, the result might show that plaintiff was actually overpaid compared to these other employees. Thus, Ms. Smiley-Smith's determination that plaintiff was treated differently from those who were similarly situated is not a valid conclusion.

In addition, as noted above, Ms. Smiley-Smith is not qualified to determine that these other measures of performance used by defendant are not valid measures of performance. Ms. Smiley-Smith's training is in accounting and her experience is primarily related to consulting in the field of utility regulation. Although Ms. Smiley-Smith does have some experience in civil litigation in computing damages potentially due to individual plaintiffs, Ms. Smiley-Smith has no

17

documented experience in computing damages in an employment discrimination case[7] and no experience in developing and assessing the proper methods for evaluating the performance of sales personnel. Although some person might be qualified to testify as to the "fairness" of defendant's methods of evaluation, Ms. Smiley-Smith is not that person.[8] This fact goes to both the reliability of her opinions as well as the qualification of Ms. Smiley-Smith to give those opinions.

The final consideration is Ms. Smiley-Smith's qualification to give an opinion as to plaintiff's damages. Ms. Smiley-Smith may be qualified based upon her training and experience to testify as to the amount of damages suffered by plaintiff. Such a damage computation would require a determination of the proper comparators, however. As noted above, Ms. Smiley-Smith's report is not reliable, and, therefore, the proper comparators have not been determined and are not known. As stated by the defendant, Ms. Smiley-Smith's basis for choosing Havicus, Robbins and Carroll as proxies for what plaintiff should have made in the absence of the alleged discrimination is arbitrary, is not based on any scientific and accepted technique, and has no basis in the facts of the case. Therefore, Ms. Smiley-Smith's damage calculations contained in the expert report are not reliable and are due to be excluded.

---

[7] As noted above, the only employment discrimination case for which Ms. Smiley-Smith was hired as an expert settled before Ms. Smiley-Smith was deposed, offered any testimony or was certified as an expert.

[8] The court should note, however, that even if some person were qualified to testify as to the fairness of the defendant's evaluation process, that testimony might not be admissible because that system was, in fact, used by defendant. To be admissible in a disparate treatment case, the testimony would probably have to show that the system was intentionally unfair to some protected group such as minorities or older workers.

For the reasons stated above, the court is of the opinion that the report and testimony of Ms. Smiley-Smith are due to be excluded from the trial of the present action because the opinions expressed by Ms. Smiley-Smith are not reliable and Ms. Smiley-Smith is not qualified to form the opinions, reach the conclusions and make the assumptions that she has made in formulating her report and testimony.

## CONCLUSION

Based on the foregoing, the court is of the opinion that the expert report and testimony of Ms. Smiley-Smith offered by plaintiff are due to be excluded. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 1st day of August, 1997.

SHARON LOVELACE BLACKBURN
United States District Judge